UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ESPN, INC.,<br><br>                              Plaintiff,<br>      v.<br>QUIKSILVER, INC.,<br><br>                              Defendant.<br><br>QUIKSILVER, INC.,<br><br>                              Counterclaimant,<br>      v.<br>ESPN, INC.,<br><br>                              Counterdefendant. | 08 Civ. 4222 (CM) (MHD)<br>ECF Case<br><br>**DEFENDANT QUIKSILVER, INC.'S<br>ANSWER AND COUNTERCLAIMS**<br><br><br>**DEMAND FOR JURY TRIAL** |

Pursuant to Rule 8(b) of the Federal Rules of Civil Procedure, defendant Quiksilver, Inc. ("Quiksilver" or "Defendant") answers Plaintiff ESPN, Inc.'s ("ESPN" or "Plaintiff") Complaint as follows:

## INTRODUCTION

1.     In answer to the allegations of paragraph 1, Quiksilver admits that Plaintiff's Complaint purports to assert claims of trademark infringement and unfair competition, but otherwise denies each and every allegation of that paragraph.

## PARTIES

**Plaintiff ESPN, Inc.**

2.     In answer to the allegations of paragraph 2, Quiksilver admits that ESPN is a Delaware corporation with its principal place of business in Bristol, Connecticut.  Quiksilver lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations of paragraph 2, and on that basis denies each and every such remaining allegation.

3.     In answer to the allegations of paragraph 3, Quiksilver lacks knowledge or

information sufficient to form a belief regarding the truth of the allegations of that paragraph, and on that basis denies each and every allegation of that paragraph.

4.   In answer to the allegations of paragraph 4, Quiksilver admits that the X Games features skateboarding, snowboarding, and surfing.  Quiksilver lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations of paragraph 4, and on that basis denies each and every such remaining allegation.

5.   In answer to the allegations of paragraph 5, Quiksilver admits Kelly Slater has participated in the X Games.  Quiksilver lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations of paragraph 5, and on that basis denies each and every such remaining allegation.

**Defendant Quiksilver, Inc.**

6.   Quiksilver admits the allegations of paragraph 6.

7.   In answer to the allegations of paragraph 7, Quiksilver admits it designs, produces, and distributes surfwear and other boardsport-related equipment, among other goods. Quiksilver denies the remaining allegations of paragraph 7.

8.   In answer to the allegations of paragraph 8, Quiksilver admits it sponsors numerous amateur and professional surfers, snowboarders, skiers, and skateboarders, including Kelly Slater and Tony Hawk.  Quiksilver denies the remaining allegations of paragraph 8.

## JURISDICTION

9.   Paragraph 9 is a legal conclusion that does not require a response.

10.   Paragraph 10 is a legal conclusion that does not require a response.

11.   Paragraph 11 is a legal conclusion that does not require a response.

## THE ALLEGED ESPN X TRADEMARKS

12.   In answer to the allegations of paragraph 12, Quiksilver admits that Plaintiff has been issued federal trademark registrations under Registration Numbers 2,089,996 for goods in Class 41; 2,126,126 for goods in Class 25; 2,211,559 for goods in Class 9; and 3,117,522 for goods in Class 16.  Quiksilver lacks knowledge or information sufficient to form a

belief regarding the truth of the remaining allegations of paragraph 12, and on that basis denies each and every such remaining allegation.

13.     In answer to the allegations of paragraph 13, Quiksilver admits that Plaintiff has filed trademark applications for a stylized "X Games" mark and a stylized "X" mark for various goods.   Quiksilver lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations of paragraph 13, and on that basis denies each and every such remaining allegation.

14.     Quiksilver denies the allegations of paragraph 14.

15.     Quiksilver denies the allegations of paragraph 15.

16.     In answer to the allegations of paragraph 16, Quiksilver lacks knowledge or information sufficient to form a belief regarding the truth of the allegations of that paragraph, and on that basis denies each and every allegation of that paragraph.

## ALLEGED INFRINGEMENT

17.     In answer to the allegations of paragraph 17, Quiksilver admits it sells its products in stores in New York as well as throughout the United States, on the Internet, and internationally.   Quiksilver denies the remaining allegations of paragraph 17.

18.     Quiksilver denies the allegations of paragraph 18.   Quiksilver further avers that it began using X-related trademarks and/or ornamentation no later than the mid-1980s, approximately 10 years prior to ESPN's admitted first use of its purported X Games marks.

19.     Quiksilver denies the allegations of paragraph 19.   Quiksilver further avers that there was only a single "protest" from ESPN prior to the filing of this lawsuit, in the form of a letter sent in September 2007, which letter was promptly responded to by Quiksilver. Quiksilver additionally avers that it has used X-related trademarks and/or ornamentation since no later than the mid-1980s, approximately 10 years prior to ESPN's admitted first use of its purported X Games marks.

20.     Quiksilver denies the allegations of paragraph 20.   Quiksilver further avers that it began using X-related trademarks and/or ornamentation no later than the mid-1980s,

approximately 10 years prior to ESPN's admitted first use of its purported X Games marks.

21. In answer to the allegations of paragraph 21, Quiksilver admits that it did not receive authorization from ESPN to use X-related trademarks and/or ornamentation. Quiksilver denies the remaining allegations of paragraph 21, and further avers that no authorization was necessary because, among other reasons, Quiksilver is the senior user of such X-related trademarks. Quiksilver additionally avers that ESPN began using its X-related trademarks without Quiksilver's permission or authorization.

22. Quiksilver denies the allegations of paragraph 22. Quiksilver further avers that, to the extent there has been any confusion, such confusion was caused by ESPN's infringing use of Quiksilver's X-related trademarks.

23. Quiksilver denies the allegations of paragraph 23. Quiksilver further avers that, to the extent there has been any dilution of anyone's trademarks, ESPN is responsible for diluting Quiksilver's X-related trademarks, which are senior to ESPN's X Games marks.

## FIRST CAUSE OF ACTION
### (FEDERAL TRADEMARK INFRINGEMENT OF X GAME MARKS 2089996, 2126126, 2211559, AND 3117522 UNDER 15 U.S.C. § 1114(1)(a))

24. In answer to the allegations of paragraph 24, Quiksilver restates the answers contained in paragraphs 1 through 23 respectively and incorporates those answers herein by reference.

25. Quiksilver denies the allegations of paragraph 25.

26. Quiksilver denies the allegations of paragraph 26.

27. Quiksilver denies the allegations of paragraph 27.

28. Quiksilver denies the allegations of paragraph 28.

29. Quiksilver denies the allegations of paragraph 29. Quiksilver further avers that ESPN is not entitled to any remedy whatsoever by virtue of its Complaint.

## SECOND CAUSE OF ACTION
## (TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION UNDER
## 15 U.S.C. § 1125(a))

30.    In answer to the allegations of paragraph 30, Quiksilver restates the answers contained in paragraphs 1 through 29 respectively and incorporates those answers herein by reference.

31.    Quiksilver denies the allegations of paragraph 31.

32.    Quiksilver denies the allegations of paragraph 32 (incorrectly numbered as paragraph 25).

33.    Quiksilver denies the allegations of paragraph 33 (incorrectly numbered as paragraph 32).

34.    Quiksilver denies the allegations of paragraph 34 (incorrectly numbered as paragraph 33).  Quiksilver further avers that ESPN is not entitled to any remedy whatsoever by virtue of its Complaint.

## THIRD CAUSE OF ACTION
## (ANTI-DILUTION PURSUANT TO NEW YORK GBL § 360-1)

35.    In answer to the allegations of paragraph 35 (incorrectly numbered as paragraph 34), Quiksilver restates the answers contained in paragraphs 1 through 34 respectively and incorporates those answers herein by reference.

36.    Quiksilver denies the allegations of paragraph 36 (incorrectly numbered as paragraph 35).

37.    Quiksilver denies the allegations of paragraph 37 (incorrectly numbered as paragraph 36).

38.    Quiksilver denies the allegations of paragraph 38 (incorrectly numbered as paragraph 37).  Quiksilver further avers that ESPN is not entitled to any remedy whatsoever by virtue of its Complaint.

## FOURTH CAUSE OF ACTION
## (VIOLATION OF NEW YORK COMMON LAW)

39.     In answer to the allegations of paragraph 39 (incorrectly numbered as paragraph 38), Quiksilver restates the answers contained in paragraphs 1 through 38 respectively and incorporates those answers herein by reference.

40.     Quiksilver denies the allegations of paragraph 40 (incorrectly numbered as paragraph 39).

41.     Quiksilver denies the allegations of paragraph 41 (incorrectly numbered as paragraph 40).  Quiksilver further avers that ESPN is not entitled to any remedy whatsoever by virtue of its Complaint.

## PLAINTIFF'S PRAYER FOR RELIEF

42.     The remaining paragraphs in the Complaint constitute Plaintiff's prayer for relief to which no answer is required.  To the extent that the prayer for relief purports to state any factual allegations, Quiksilver denies them.

## AFFIRMATIVE DEFENSES

As separate and distinct affirmative defenses to Plaintiff's alleged claims for relief, Quiksilver alleges as follows:

### First Affirmative Defense

(Failure to State a Claim)

1.     Plaintiff's purported claims for relief fail to state facts sufficient to constitute claims upon which relief can be granted against Quiksilver.

### Second Affirmative Defense

(Statute of Limitations)

2.     Plaintiff's purported claims for relief are barred in whole or in part by the applicable statute of limitations.

### Third Affirmative Defense

(Laches)

3.      Plaintiff's purported claims for relief are barred in whole or in part by the doctrine of laches.

### Fourth Affirmative Defense

(Unclean Hands)

4.      Quiksilver is informed and believes, and on that basis alleges, that by reason of Plaintiff's conduct, Plaintiff's purported claims for relief are barred in whole or in part by the doctrine of unclean hands.

### Fifth Affirmative Defense

(Waiver)

5.      Quiksilver is informed and believes, and on that basis alleges, that by reason of Plaintiff's conduct, Plaintiff's purported claims for relief are barred in whole or in part by the doctrine of waiver.

### Sixth Affirmative Defense

(Acquiescence)

6.      Quiksilver is informed and believes, and on that basis alleges, that Plaintiff's purported claims for relief are barred in whole or in part by its acquiescence to Quiksilver's actions and its acquiescence to other companies' use of "X" as part of their trademarks.

### Seventh Affirmative Defense

(Estoppel)

7.      Plaintiff's purported claims for relief are barred in whole or in part by the doctrine of estoppel.

### Eighth Affirmative Defense

(Non-Willful Conduct)

8.      Any and all acts alleged to have been committed by Quiksilver, if

performed, were performed with lack of knowledge and lack of willful intent.

## Ninth Affirmative Defense

### (Fair Competition)

9.     Quiksilver's alleged actions, to the extent true, constitute fair competition in business.

## Tenth Affirmative Defense

### (Justification and Privilege)

10.     Plaintiff's purported claims, and each of them, are barred in whole or in part because Quiksilver's actions respecting the subject matters alleged in the Complaint, and each of them, to the extent that they were taken at all, were undertaken in good faith, and constitute lawful, proper, and justified means to further its purpose of engaging in and continuing its business.

## Eleventh Affirmative Defense

### (Remote, Speculative And Contingent Damages)

11.     To the extent that Plaintiff claims damages that will be incurred in the future, such damages may not be recovered as they are remote, speculative, and contingent.

## Twelfth Affirmative Defense

### (Double Recovery)

12.     Plaintiff's purported claims for relief are barred to the extent Plaintiff is seeking double recovery for the same alleged wrong.

## Thirteenth Affirmative Defense

### (Punitive Damages Unconstitutional)

13.     To the extent Plaintiff seeks punitive damages, this violates Quiksilver's rights under the United States Constitution.

## Fourteenth Affirmative Defense

### (Priority of Use)

14.     Plaintiff's purported claims for relief fail in whole or in part because

Quiksilver is the senior user of the alleged marks.

## Fifteenth Affirmative Defense

### (Non-Trademark Use)

15.    Plaintiff's purported claims for relief fail in whole or in part because some or all of the alleged infringement by Quiksilver constitutes non-trademark use.

## Sixteenth Affirmative Defense

### (Fraudulently Obtained Registrations)

16.    Quiksilver is informed and believes, and on that basis alleges, that Plaintiff's purported claims for relief fail in whole or in part because Plaintiff's alleged trademark registrations were obtained fraudulently, by failing to inform the United States Patent and Trademark Office ("USPTO") of Quiksilver's prior rights, as well as declaring under penalty of perjury to use of the registered marks on goods which the marks were not actually used upon in commerce.

## Seventeenth Affirmative Defense

### (Generic Term)

17.    Plaintiff's purported claims for relief fail in whole or in part because Plaintiff's alleged marks are generic.

## Eighteenth Affirmative Defense

### (Terms Are Non-Distinctive and Lack Secondary Meaning)

18.    Plaintiff's purported claims for relief fail in whole or in part because Plaintiff's alleged marks are non-distinctive and lack secondary meaning.

## Nineteenth Affirmative Defense

### (No Likelihood of Confusion)

19.    Plaintiff's purported claims for relief fail in whole or in part because there is no likelihood of confusion between Plaintiff's alleged marks and Defendant's marks.

## Twentieth Affirmative Defense

(Right to Amend)

20.     Quiksilver reserves the right to rely on all further affirmative defenses that become available or appear during discovery proceedings in this action, and Quiksilver further reserves the right to amend this Answer for the purpose of asserting any such additional affirmative defenses.

**WHEREFORE,** Quiksilver prays for the following relief:

1.     That ESPN take nothing by reason of its Complaint;

2.     That Quiksilver be awarded its costs and attorneys' fees; and

3.     For such other and further relief as the Court may deem just and proper.

## COUNTERCLAIM

Quiksilver, Inc. ("Quiksilver" or "Counterclaimant") hereby complains against ESPN, Inc. ("ESPN" or "Counterdefendant") as follows:

### NATURE OF THE ACTION

1.      This is a civil action for trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1125(a), and New York state law.

### JURISDICTION AND VENUE

2.      This action is within the jurisdiction of this Court by virtue of the Lanham Act, 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331 (federal question jurisdiction).  The Court has supplemental jurisdiction over Counterclaimant's state law claims pursuant to 28 U.S.C. §§ 1367(a).

3.      This Court has personal jurisdiction over Counterdefendant because Counterdefendant has sufficient minimum contacts in the State of New York to satisfy New York's long-arm statute and Constitutional due process requirements.

4.      Venue in this Court exists under 28 U.S.C. § 1391(b)(1), as Counterdefendant is deemed to reside in this District because it is subject to personal jurisdiction in this District.

### THE PARTIES

5.      Counterclaimant Quiksilver is a Delaware corporation having its principal place of business in Huntington Beach, California.

6.      On information and belief, Counterdefendant ESPN is a Delaware corporation with its principal place of business in Bristol, Connecticut.  On information and belief, ESPN also maintains its West Coast headquarters in the Los Angeles area, which will be moving into a new facility in 2009.

### GENERAL ALLEGATIONS

#### Quiksilver

7.      In 1976, Quiksilver began operations as a California company, making

boardshorts and other clothing products for surfers in the United States under a license agreement with the Quiksilver brand founders in Australia.  Quiksilver expanded its product offerings in the 1980s as it grew its distribution channels.

8.     In 1991, Quiksilver acquired the European licensee of the Quiksilver brand and introduced "Roxy," a surf brand for junior girls.  It further expanded in the 1990s by adding new products and designs, and introduced a proprietary retail store concept, Boardriders Clubs, which displays the heritage and products of "Quiksilver" and "Roxy."

9.     In May 2004, Quiksilver acquired DC Shoes, Inc. to expand its presence in action sports-inspired footwear.

10.     Quiksilver's global and North American headquarters are in Huntington Beach, California, while its European headquarters are in St. Jean de Luz, France, and its Asia/Pacific headquarters are in Torquay, Australia.

11.     Brand building has been a key to Quiksilver's growth, and the company has always maintained its roots in the boardriding lifestyle.  Today, Quiksilver's products are sold in many countries throughout the world, primarily in surf shops, snow shops, skate shops, and select department stores.

12.     Quiksilver also hosts prestigious and highly influential cultural events and contests, including, but not limited to, the Quiksilver Pro Australia, the Quiksilver Pro France, the Quiksilver ISA World Junior Surfing Championships, the Quiksilver Big Wave Invitational, the Roxy Pro, and the Quiksilver Bowlriders skateboard contest.

13.     Quiksilver also sponsors premier athletes, including pro surfers like Kelly Slater, Dane Reynolds, Julian Wilson, and Clay Marzo; pro skateboarders, such as Tony Hawk, Danny Way and Reese Forbes; and pro snowboarders, such as Travis Rice, Todd Richards, and Torah Bright.

## Quiksilver's Trademarks and Product Designs

14.     Quiksilver owns multiple international and domestic trademarks associated with its well-known product lines.  One of its well-known marks is the ubiquitous

mountain and wave logo (the "Quiksilver Logo"):



The Quiksilver Logo is used as a stand-alone mark, and also is incorporated into several of Quiksilver's other marks.

15.     Since no later than 1986, Quiksilver began incorporating an "X" symbol into its boardshorts and other clothing designs and marketing materials:

  

Subsequently, and by no later than 1989, Quiksilver developed the Generation X brand, which was created to symbolize a new generation of surfers and boardriders, and utilized the "X" as the consistent centerpiece of the brand image.  The X symbol, which has been incorporated into many different designs, constitutes a trademark of Quiksilver.  The designs are collectively referred to as the "Gen X Brand."

16.     The Gen X Brand has been used in connection with a variety of products and marketing materials.  While, over the years, the Gen X Brand has included variations of different designs, all of the designs feature the letter "X."  For example, by no later than 1989, Quiksilver debuted a colored X on a dark background with the Quiksilver Logo below it:



and an X on a colored background with the Quiksilver Logo above it and the word "Generation" on top of it:



The Gen X Brand advertisements featured famous surfers Kelly Slater and Rainus Hayes, and

the product categories using the Gen X Brand included t-shirts, boardshorts, hats, and stickers. Many of the Gen X Brand products also featured Xs as additional ornamentation.

17.     In 1990, Quiksilver published "X Factor," a publication which featured contests, articles about surfing and Quiksilver, and surf movie reviews, including a review of Quiksilver's "GEN X" movie:



18.     In 1992, Quiksilver produced and distributed the "Mondo X-Treme X-periment" video, featuring surfing, skateboarding and snowboarding highlights:



19.     By no later than 1992, the Gen X Brand was expanded to Quiksilver's winter sports product category, and featured the "X 1" and "Surfers of Fortune" designs:

     

20.     By no later than 1993, Quiksilver's snow line introduced the Gen X Brand's "X-Ray/Mechanical X" design, which featured a drawing of a doctor viewing an x-ray of a man's chest, with an "X" in the upper left corner of the design:



The X-Ray design was featured on t-shirts, jackets, and flight suits, and was often included in the inner tag area of the garment.

21.     By no later than the summer of 1994, Quiksilver's Gen X Brand debuted a

new Mechanical X design that included a drawing of parents scolding a young boy whose head has been replaced by an "X":



This design was featured on t-shirts, jackets, and other articles of clothing.  By no later than 1994, Quiksilver introduced the Gen X Brand's "Knockout X" design, which featured a colored X on a dark background with the name QUIKSILVER to its right, with "QUIK" in a dark color on a light background and "SILVER" in a light color on a dark background:



the "Stretch X" design, featuring a stylized X above the word QUIK above the Quiksilver Logo;



and the "Quiksilver X" design, which was made up of a large colored X with a contrast-colored Quiksilver Logo in the middle of the X:



These designs were used on t-shirts, stickers, and other items.

   22. By no later than 1995, Quiksilver further expanded the Gen X Brand, and adopted additional designs, such as the "Hibiscuit" (the Quiksilver Logo with an X below it flanked on each side by a hibiscus flower):



   23. Throughout 1996 and 1997, various new designs were used within the Gen X Brand on many different products, including t-shirts, caps, and stickers, including:  The simple "X Mark," a dark-colored X on a lighter colored background, displayed in conjunction with the

Quiksilver name and/or Quiksilver Logo:



the "QUIX" design (with the Quiksilver Logo as the "Q"):



the "America's Future X" design (a large X with America's Future written in script on top of it):



and the "X File" design (a medium-colored X on a dark background with the word "Quik" on top of it in a light color):



24.     By no later than 1998, two new X designs were introduced in the Gen X Brand: the "Band Aid" design, which featured an X made out of a light and a dark band-aid criss-crossing with the Quiksilver Logo and name across it:



and the "X-Treme" design, a large light colored X with the Quiksilver Logo in the bottom right leg of the X and "TREME" across it:



These new Gen X Brand designs were used on t-shirts and wetsuits.

25.     By no later than 2000, as part of the Gen X Brand, Quiksilver began using the "X70" design. The "X70" design featured a large dark colored X with the Quiksilver Logo in the bottom right leg of the X, and "70" adjacent to the X on the right side:



The "X70" design was used on t-shirts, boardshorts, woven shirts, walking shorts, pants, jackets, hats, backpacks and visors.

26.     Through the present, Quiksilver continues to feature the Gen X Brand and complementary X ornamentation on its products and in its advertising, in particular the "Quiksilver X" design, which was first introduced no later than 1994:



### ESPN and the X Games

27.     Quiksilver is informed and believes, and on that basis alleges, that when ESPN first conceived of an extreme sports competition, it did not conceive of associating that competition with the letter "X."  In fact, the first ESPN extreme sports competition, which took place in the summer of 1995 in Rhode Island and Vermont, was called the "Extreme Games."

28.     Quiksilver is informed and believes, and on that basis alleges, that ESPN turned to Quiksilver for inspiration for use of the term "X," as Quiksilver had been using that term in connection with its Gen X Brand for many years.  Moreover, on information and belief, ESPN broadcasted Quiksilver events and other action sports events and contests featuring athletes such as Kelly Slater long before it conceived of using any "X" trademarks, and ESPN used Quiksilver's superior reputation in action sports in order to attempt to gain credibility in that field.

29.     Quiksilver is informed and believes, and on that basis alleges, that long after Quiksilver launched its Gen X Brand, ESPN and its sales staff still did not even understand the significance of the letter "X" as it related to Generation X, and requested information on that significance.

30.     After initially calling its extreme sports competition the "Extreme Games," ESPN renamed its competition the "X Games."  In 1997, the X Games moved to San

Diego, California, and ESPN introduced a winter version of the games, held in Big Bear Lake, California.

31.     The Summer and Winter X Games became annual events, periodically moving to different locations.  After the inaugural games in Big Bear Lake, the Winter X Games have been held regularly in Colorado, with two years spent in Vermont (2000-2001).  The Summer X Games spent another year in San Diego, then moved to San Francisco for two years (1999-2000), then Philadelphia for two years (2001-2002), until settling in Los Angeles, where it has been held since 2003 and will be held until at least 2009.  The 2008 Summer X Games will be held in Los Angeles on July 31st through August 3rd.

32.     The Summer X Games feature sporting events such as freestyle BMX, motocross, skateboarding, and surfing.  The Winter X Games feature events like skiing and snowboarding.  Notable athletes who have participated in the X Games are surfer Kelly Slater, skateboarder Tony Hawk, and snowboarder/skateboarder Shaun White.

33.     ESPN's X Games usually feature corporate sponsors.  Past X Games have been co-sponsored by Quiksilver's DC Shoes brand.  Quiksilver co-sponsored the Winter X Games in 2005.

### ESPN's Trademarks

34.     ESPN holds several registrations for its X GAMES mark (collectively, the "X Games Federal Registrations"):

a.     X GAMES, Reg. No. 2,089,996 (August 19, 1997) with alleged first use in commerce on March 30, 1996;

b.     X GAMES, Reg. No. 2,126,126 (December 30, 1997) for, among other things, neckties, belts, blouses, dresses, pajamas, footwear, socks, underwear, skirts, scarves, sleepwear, and sun visors, with alleged first use in commerce on March 30, 1996;

c.     X GAMES, Reg. No. 2,211,559 (December 15, 1998) with alleged first use in commerce on May 28, 1998;

d.     X GAMES, Reg. No. 3,117,522 (July 18, 2006) for, among other

things, wood case pencils, mechanical pencils, erasers, and hand-held sharpeners for pencils, with alleged first use in commerce on August 31, 2005;

        e.      WINTER X GAMES, Reg. No. 2,126,110 (December 30, 1997) for, among other things, neckties, belts, blouses, dresses, pajamas, footwear, socks, underwear, skirts, scarves, sleepwear, and sun visors, with alleged first use in commerce on October 31, 1996;

        f.      WINTER X GAMES, Reg. No. 2,312,118 (January 25, 2000) with alleged first use in commerce on October 31, 1996;

        g.      WINTER X GAMES, Reg. No. 2,556,221 (April 2, 2002) with alleged first use in commerce in September 1996;

        h.      WINTER X GAMES, Reg. No. 2,648,501 (November 12, 2002) with alleged first use in commerce on October 24, 2000.

        35.      ESPN also has several pending trademark applications for the X GAMES word mark as well as for its newly-adopted logos  and , in numerous classes of goods. The applications for the new logos are intent-to-use applications, with no first use date indicated, but ESPN has begun using these logos on its X Games website (*see*, *e.g.*, http://expn.go.com/gear/index.html). All of the ESPN marks describe above are, collectively, referred to as the "X Games Marks."

### Third Party "X" Trademarks

        36.      Quiksilver and ESPN are not the only companies in the apparel market to use X-related marks on their goods. Numerous third party companies feature "X" marks on goods such as clothing, footwear, and even lingerie. For example, Heeling Sports Limited uses a stylized X SPORT mark, , on footwear (Registration No. 2,646,550), and claims to have been doing so since 2000; X-Factor Sportswear features a stylized X, , on its clothes and hats (Registration No. 3,261,570) and claims to have doing so since 2005; Noble Fiber Technologies, LLC uses a stylized X, , and the mark X-SHIRT on shirts and clothing (Registration Nos. 3,288,899 and 3,057,893), and has claimed to use these marks since 2001 and

2005, respectively; and Marvel Characters, Inc. uses the X-MEN mark on clothing (Registration No. 2,052,216), and claims to have been doing so since September 1992.

37.     There are many other companies with pending trademark applications for X-related marks for clothing and related apparel goods, such as X WEAR, , (Serial No. 78/374,957) filed February 26, 2004, by Yvonne R. Rainey, claimed use in commerce since December 13, 2003; X GEAR,  , (Serial No. 77/035,156) filed November 2, 2006, by Troy M. Daniels; X GEAR (Serial No. 77/331,766) filed November 16, 2007, by Metro Entertainment Group and Sports Talent Agency, Inc.; X WETSUITS (Serial No. 77/084,168) filed January 16, 2007, by Television Events and Marketing, Inc.; XDRESS, (Serial No. 77/359,698) filed December 26, 2007 by David Bonfield; and simply "X" (Serial No. 76/132,702) filed September 21, 2000 by Bombardier Recreational Products, Inc.

38.     The amount of third party use increases even more in markets beyond apparel.  For example, Brainstorm Product, LLC uses the mark X SPORT on toys (Registration No. 2,854,459), and claims to have been doing so since 2002; XSports Collectables, LLC is using the stylized XSPORTS mark,  , (Serial No. 77/341,751) for video games and figurines; Xybernaut Corporation is using the stylized X mark,  , (Registration No. 2,577,649) for toys, and claims to have been doing so since 2000; Microsoft Corporation owns several X marks, including the mark "X," (Registration No. 2,867,060) for computer games and accessories, claimed in use since 2001; the stylized X mark, , for computer games and video games (Serial No. 77/031,446); the stylized X mark, , for interactive video games (Registration No. 3,240,776), claimed in use since 2005; the stylized X mark,  , for video game consoles (Registration No. 2,741,764), claimed in use since 2001, the stylized X mark, , for video game consoles (Registration No. 2,779,447), claimed in use since 2001.

### ESPN's Lawsuit Against Quiksilver

39.     Notwithstanding Quiksilver's long-standing trademark rights in its Gen X Brand, on September 27, 2007, at least eighteen years after Quiksilver first adopted the Gen X Brand, ESPN sent Quiksilver a cease-and-desist letter, demanding that Quiksilver cease all use

of "a stylized X mark . . . [that] is identical to ESPN's stylized X mark."

40.     Quiksilver promptly responded to ESPN's letter on October 31, 2007, and alerted ESPN to Quiksilver's extensive prior rights in its Gen X Brand, specifically mentioning Quiksilver's adoption of the Gen X Brand in 1989.

41.     Despite being on notice of Quiksilver's priority of use, and without engaging in any additional dialogue with Quiksilver about this issue or, on information and belief, any additional investigation into Quiksilver's use of its Gen X Brand, ESPN inexplicably filed a complaint against Quiksilver on May 2, 2008, alleging trademark infringement, dilution, and unfair competition.  To support its spurious allegations, ESPN erroneously alleged in its complaint that the "Quiksilver X" design was first used in 2007, even though that trademark, as part of the Gen X Brand, has been used on multiple products for over 13 years, use that ESPN would clearly know about given its close association with Quiksilver's sponsored athletes and Quiksilver's visibility in the action sports market.

## FIRST COUNTERCLAIM

### (Declaratory Relief)

42.     Quiksilver realleges and incorporates by reference the allegations of paragraphs 1 through 41 above, as if fully set forth herein.

43.     An actual controversy has arisen and now exists between Quiksilver and ESPN, in that ESPN contends that Quiksilver's use of its Gen X Brand constitutes trademark infringement, dilution, and unfair competition under the Lanham Act and New York law. Quiksilver denies and disputes these allegations.

44.     Quiksilver desires and requests the intervention of the Court to resolve the competing contentions of the parties arising under federal and state law, and asks that the Court determine and declare that:

a.     Quiksilver is the senior use of the Gen X Brand;

b.     Quiksilver's use of Xs on its products as complementary ornamentation to the Gen X Brand is non-trademark use;

c.      Quiksilver's use of the Gen X Brand does not infringe or dilute ESPN's X Games Marks because Quiksilver has priority of use and/or the use of Xs as ornamentation is non-trademark use;

d.      Quiksilver's use of the Gen X Brand does not constitute unfair competition vis-à-vis ESPN's X Games Marks because Quiksilver has priority of use and/or the use of Xs as ornamentation is non-trademark use; and

e.      Quiksilver's use of the Gen X Brand does not dilute ESPN's X Games Marks because the X Games Marks are sufficiently diluted by the voluminous third party use of X-related marks such that Quiksilver's marks cannot further dilute them.

## SECOND COUNTERCLAIM

### (Trademark Infringement and Unfair Competition under 15 U.S.C. § 1125(a))

45.      Quiksilver realleges and incorporates by reference the allegations of paragraphs 1 through 44 above, as if fully set forth herein.

46.      Since at least 1989, Quiksilver has consistently used the Gen X Brand on its products.  Quiksilver has invested considerable time, effort, and expense in the creation, advertising, and promotion of its Gen X Brand in connection with its clothing items and related products.

47.      By virtue of its longstanding use of the Gen X Brand, Quiksilver has developed a valuable reputation for quality and goodwill associated with that brand.  Consumers recognize and associate the Gen X Brand as originating from Quiksilver.  Moreover, Quiksilver has established significant common-law trademark rights in connection with its Gen X Brand.

48.      Quiksilver's use and rights in the Gen X Brand significantly predate, by approximately ten years, any use or rights ESPN has in the X Games Marks.  Accordingly, Quiksilver has superior rights and priority in and to the Gen X Brand.

49.      ESPN has asserted that the parties' marks cannot co-exist.  Thus, ESPN, through its use of the junior X Games Marks, has been and is engaged in trademark infringement and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  On

information and belief, this infringement and unfair competition is knowing and willful.

50.     As a proximate result of ESPN's acts, Quiksilver has suffered, and will continue to suffer, substantial damage to its reputation and goodwill, as well as injury to its current and potential customer base and loss of revenues, in an amount not yet ascertained.

51.     Quiksilver is further entitled to recover ESPN's profits and reasonable royalties for the infringing use of the Gen X Brand, together with damages, each of which may be trebled due to ESPN's willful acts of infringement.

52.     ESPN's intentional and willful activities have caused, and will continue to cause, irreparable harm to Quiksilver for which Quiksilver has no adequate remedy at law. Accordingly, Quiksilver is entitled to injunctive relief that permanently bars ESPN from any use of its X Games Marks.

53.     ESPN's willful conduct renders this an exceptional case, further entitling Quiksilver to recover its attorneys' fees and costs of suit pursuant to 15 U.S.C. § 1117.

## THIRD COUNTERCLAIM

### (Trademark Dilution under NY GBL § 360-l)

54.     Quiksilver realleges and incorporates by reference the allegations of paragraphs 1 through 53 above, as if fully set forth herein.

55.     ESPN's use of the X Games Marks violates Section 360-l of New York State General Business Law, in that the use creates a likelihood of injury to Quiksilver's business reputation and dilution of Quiksilver's Gen X Brand.

56.     Accordingly, Quiksilver is entitled to injunctive relief permanently barring ESPN from any further use of its X Games Marks.

## FOURTH COUNTERCLAIM

### (New York Common Law Unfair Competition)

57.     Quiksilver realleges and incorporates by reference the allegations of paragraphs 1 through 56 above, as if fully set forth herein.

58.     ESPN's bad faith misappropriation of Quiksilver's Gen X Brand, in

particular, its copying of the "Quiksilver X" design, violates New York common law.

59.     Accordingly, Quiksilver is entitled to injunctive relief permanently barring ESPN from any further use of its X Games Marks.

### FIFTH COUNTERCLAIM

### (Cancellation of the X Games Federal Registrations

### under 15 U.S.C. § 1064 and 15 U.S.C. § 1119)

60.     Quiksilver realleges and incorporates by reference the allegations of paragraphs 1 through 59 above, as if fully set forth herein.

61.     ESPN currently holds eight federal trademark registrations for X Games-related marks, as detailed above.

62.     On information and belief, ESPN failed to inform the USPTO of the existence of Quiksilver's senior rights and priority in and to the Gen X Brand.  That information was material to the USPTO's determination to issue the X Games Federal Registrations.  On information and belief, the USPTO reasonably relied on ESPN's omission of this material information in determining to issue those registrations.

63.     On information and belief, ESPN has not used the registered X Games marks on all of the goods and services listed in the following registrations continuously in commerce since the indicated first use dates:

a.     X GAMES, Reg. No. 2,126,126;

b.     X GAMES, Reg. No. 3,117,522; and

c.     WINTER X GAMES, Reg. No. 2,126,110.

ESPN has thus perpetrated a fraud on the USPTO as to the above registrations by claiming exclusive rights for goods and services for which it is not entitled.

64.     Quiksilver is being damaged by the fraudulently-obtained X Games Federal Registrations, because those registrations are either being asserted against Quiksilver in this litigation or may be asserted against Quiksilver in future lawsuits or opposition/cancellation proceedings.

**WHEREFORE,** Quiksilver prays for the following relief:

1.      For a declaratory judgment that:

      a.      Quiksilver is the senior user of the Gen X Brand;

      b.      Quiksilver's use of Xs on its products as complementary ornamentation to the Gen X Brand is non-trademark use;

      c.      Quiksilver's use of the Gen X Brand does not infringe or dilute ESPN's X Games Marks because Quiksilver has priority of use and/or the use of Xs as ornamentation is non-trademark use;

      d.      Quiksilver's use of the Gen X Brand does not constitute unfair competition vis-à-vis ESPN's X Games Marks because Quiksilver has priority of use and/or the use of Xs as ornamentation is non-trademark use; and

      e.      Quiksilver's use of the Gen X Brand does not dilute ESPN's X Games Marks because the X Games Marks are sufficiently diluted by the voluminous third party use of X-related marks such that Quiksilver's marks cannot further dilute them.

2.      For preliminary and permanent injunctions against ESPN and its officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with each of them, who receive actual notice hereof by personal service or otherwise, enjoining and restraining them from any further use of the X Games Marks, or any other trademarks similar to the Gen X Brand, including the withdrawal of any pending trademark applications for such marks;

3.      For the cancellation of ESPN's X Games Federal Registrations;

4.      For general, special, actual, punitive, and/or statutory damages, according to proof at trial;

5.      For treble damages;

6.      For an accounting and disgorgement of ESPN's profits earned on the sale of goods using the X Games Marks;

7.      For Quiksilver's costs and attorneys' fees;

8.      For interest at the legal rate; and

9.      For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Quiksilver demands

a trial by jury on all claims so triable.

Dated: Costa Mesa, California

      June 16, 2008                     LATHAM & WATKINS LLP

                                          By:   /s/ Mark A. Finkelstein
                                            Kenneth Conboy (KC 1154)
                                            Jaron R. Shipp (JS 6365)
                                            885 Third Avenue, Suite 1000
                                            New York, New York 10022
                                            (212) 906-1200
                                            kenneth.conboy@lw.com
                                            jaron.shipp@lw.com

                                            Mark A. Finkelstein (MF 1040)
                                            650 Town Center Drive, Suite 2000
                                            Costa Mesa, California 92626
                                            (714) 540-1235
                                            mark.finkelstein@lw.com
                                            Admitted *pro hac vice*

                                            Jennifer L. Barry (JB 0245)
                                            600 West Broadway, Suite 1800
                                            San Diego, California 92101
                                            (619) 236-1234
                                            jennifer.barry@lw.com
                                            Admitted *pro hac vice*

                                            Attorneys for Defendant and
                                            Counterclaimant Quiksilver, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2008, I caused the attached document to be electronically transmitted to the Clerk's Office using the CM/ECF System.

I further certify that on this same date, I caused the attached document to be hand delivered as a Chambers Copy to:

Hon. Colleen McMahon
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl St., Room 640
New York, NY 10007

I further certify that on this same date, I caused the attached document to be sent via email and overnight delivery to:

Frank Ryan
Tamar Y. Duvdevani
Nixon Peabody LLP
437 Madison Avenue
New York, NY 10022
FRyan@nixonpeabody.com
tduvdevani@nixonpeabody.com

/s/ Mark A. Finkelstein
Mark A. Finkelstein