UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ESPN, INC.,<br><br>                          Plaintiff,<br><br>          v.<br><br>QUIKSILVER, INC.,<br><br>                          Defendant. | 08 Civ. 4222 (CM) (MHD)<br>ECF Case |
| QUIKSILVER, INC.,<br><br>                          Counterclaimant,<br><br>          v.<br><br>ESPN, INC.,<br><br>                          Counterdefendant. |  |

**DEFENDANT AND COUNTERCLAIMANT QUIKSILVER, INC.'S
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS
MOTION FOR TRANSFER OF VENUE TO THE CENTRAL DISTRICT OF
CALIFORNIA PURSUANT TO 28 U.S.C. § 1404(A)**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

I.  FACTS .................................................................................................................... 1

    A.  ESPN and the X Games .................................................................... 1

    B.  Quiksilver and the Gen X Brand ...................................................... 2

    C.  The Current Dispute ......................................................................... 3

    D.  Witnesses and Evidence Related to the X Marks .................................. 4

II.  ARGUMENT ....................................................................................................... 10

    A.  Standards for Transfer of Venue Under 28 U.S.C. § 1404(a) ............................ 10

    B.  This Action Could Have Been Brought in the Central District of
California .......................................................................................... 10

    C.  The Balance of Factors Weigh in Favor of Transfer ........................................... 11

        1.  Convenience of the Witnesses ................................................ 11

        2.  Locus of Operative Facts ....................................................... 13

        3.  Location of Relevant Documents and Sources of Proof ........................ 14

        4.  Convenience of the Parties..................................................... 14

        5.  Compelling Unwilling Witnesses .......................................... 15

        6.  Plaintiff's Choice of Forum ................................................... 16

        7.  Relative Means of the Parties ................................................. 16

        8.  Forum's Familiarity with Governing Law .............................. 16

        9.  Trial Efficiency and Interests of Justice................................. 17

III.  CONCLUSION.................................................................................................... 17

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*AEC One Stop Group, Inc. v. CD Listening Bar, Inc.*,
   326 F. Supp. 2d 525 (S.D.N.Y. 2004) ................................................................. 11

*Berman v. Informix Corp.*,
   30 F. Supp. 2d 653 (S.D.N.Y. 1998) ................................................................... 11

*Cartier v. D & D Jewelry Imps.*,
   510 F. Supp. 2d 344 (S.D.N.Y. 2007) ................................................................. 17

*Cheong v. Okayama Enters.*,
   No. 00 Civ. 03740 (GEL), 2000 U.S. Dist. LEXIS 13918
   (S.D.N.Y. Sept. 25, 2000) ................................................................................... 16

*De Jesus v. National R. Passenger Corp.*,
   725 F. Supp. 207 (S.D.N.Y. 1989) ..................................................................... 14

*Fuji Photo Film Co., LTD., v. Lexar Media, Inc.*,
   415 F. Supp. 2d 370 (S.D.N.Y. 2006) ................................................. 10, 12, 14

*Herbert Ltd. P'ship v. Elec. Arts Inc.*,
   325 F. Supp. 2d 282 (S.D.N.Y. 2004) ................................................................. 11

*January Enters. v. Buena Vista TV*,
   41 U.S.P.Q.2D 1959 (S.D.N.Y. 1997) ................................................................ 16

*Kwik Goal, Ltd. v. Youth Sports Publ'g Inc.*,
   No. 06 Civ. 395 (HB), 2006 U.S. Dist. LEXIS 34460
   (S.D.N.Y. May 31, 2006) ..................................................................................... 17

*Matra Et Manurhin v. Int'l Armament Co.*,
   628 F. Supp. 1532 (S.D.N.Y. 1986) ................................................................... 13

*Polaroid Corp. v. Polarad Elecs. Corp.*,
   287 F.2d 492 (2d Cir. 1961) .................................................................................. 4

*Posven, C.A. v. Liberty Mut. Ins. Co.*,
   303 F. Supp. 2d 391 (S.D.N.Y. 2004) ................................................................. 10

*Prudential Sec. Inc. v. Norcom Dev., Inc.*,
   No. 97 Civ. 6308 (DC) , 1998 U.S. Dist. LEXIS 10569
   (S.D.N.Y. July 15, 1998) ..................................................................................... 17

### STATUTES

28 U.S.C. § 1391(b)(1)-(2) ...................................................................................... 11

28 U.S.C. § 1404(a) ......................................................................................... 1, 10

### RULES

Fed. R. Civ. P. 13(a)(1) ........................................................................................... 16

Fed. R. Civ. P. 45(b)(2)(b) ..................................................................................... 15

## INTRODUCTION

It appears that Plaintiff ESPN, Inc. ("ESPN") decided to file this action in the Southern District of New York as part of its litigation strategy, and not because this District has any connection to the parties or the operative facts. Neither ESPN nor defendant Quiksilver, Inc. ("Quiksilver") are headquartered in this District, or incorporated in this State. None of the operative facts of this case has any direct connection to New York. Indeed, the best ESPN could muster to support its choice for venue here is that Quiksilver's stock is traded on the New York Stock Exchange.

The Central District of California, by contrast, is not only a proper venue, but the ideal venue for this lawsuit. First, Quiksilver is headquartered in that District, and ESPN maintains its West Coast headquarters there. Second, nearly all of Quiksilver's crucial witnesses, especially third-party witnesses, and documents are located there. Finally, the very events that form the basis for this action, ESPN's X Games, have been held in that District for the past five years, and will be held there again this summer. Accordingly, this case should be transferred to the Central District of California pursuant to 28 U.S.C. § 1404(a).

## I.    FACTS

### A.    ESPN and the X Games

ESPN is a Delaware corporation, with a principal place of business in Bristol, Connecticut. Complaint ¶ 2. ESPN is a "multinational, multimedia sports entertainment company . . . with over 50 business entities." *Id.* ESPN also maintains a West Coast headquarters in the Los Angeles area. Declaration of Jennifer L. Barry ("Barry Decl.") Exh. A. Moreover, ESPN is currently completing construction on a 120,000 square-foot facility in Los Angeles at the LA Live Sports and Entertainment District, which is adjacent to the Staples Center. That facility will house ESPN television and radio stations, an ESPNZone dining and entertainment center, and production facilities. *Id.*

ESPN allegedly launched the X Games, an "international gathering of alternative sports athletes," in 1996. Complaint ¶ 3. The inaugural Winter X Games were held in Big Bear

Lake, California in 1997, and subsequent games were held in Vermont and Colorado.  Barry

Decl. Exhs. B-C.  The Summer X Games have been held in Los Angeles every year since 2003,

and will be held there again this summer.  *Id.*  Prior to 2003, the Summer X Games were held in

Rhode Island and Vermont (1995-96), San Diego (1997-98), San Francisco (1999-2000), and

Philadelphia (2001-02).  *Id.*  The X Games have never been held in New York.  *Id.* at Exh. D.

ESPN has also expanded the X Games franchise, and recently hosted the Moto X World

Championships in San Diego in April 2008.  *Id.* at Exh. E.

ESPN alleges in its Complaint that one of the most famous past participants in the

X Games is surfer Kelly Slater.  Complaint ¶ 5.  ESPN also notes in its Complaint that other

X Games participants include surfers Clay Marzo and Julian Wilson, and snowboarder Travis

Rice.  Complaint ¶ 23.

ESPN alleges that it places the X Games marks on various goods, including

"shirts, shorts, hats, backpacks, pants, jackets, and other sports apparel."  Complaint ¶ 16.  These

goods are allegedly sold at "the hundreds of X Games events" as well as "on the Internet and in

department stores such as JC Penny [sic]."  *Id.*

Purported samples of ESPN's use of the X Games marks are attached to ESPN's

Complaint as Exhibit A.  Moreover, ESPN recently announced that it was expanding its X

Games branded merchandise into the footwear market by entering into an exclusive licensing

agreement with Irvine, California-based American Sporting Goods and its subsidiary Nice Skate

Shoes.  Barry Decl. at Exh. F.

**B.    Quiksilver and the Gen X Brand**

Quiksilver is a Delaware corporation.  Declaration of Mitch Milstein ("Milstein

Decl.") at ¶ 2.  Its global and North American headquarters are in Huntington Beach, California.

*Id.*  Quiksilver is an international company that designs, produces, and distributes clothing,

accessories, and related products targeted at the surfing and boardriding lifestyle.  *Id.* ¶ 3.  Its

products are sold throughout the world, primarily in surf shops, skate shops, and other specialty

stores.  *Id.*

As set forth more fully in Quiksilver's counterclaims, in addition to other inventive marks and brands, Quiksilver has developed and branded its products with an "X" trademark under its Generation X brand (the "Gen X Brand").  Counterclaim ¶ 15.  Beginning in the 1980s, Quiksilver began using the Gen X Brand and various designs on many of its products and in its advertising.[1]  *Id.*  During that same time period, it also began using "X"s in the designs on its clothing items, especially t-shirts and boardshorts, as ornamentation complementary to the Gen X Brand.  *Id.*  Quiksilver continues to use the Gen X Brand, particularly the "Quiksilver X" design (introduced at least as early as 1994), which is a large block X with the Quiksilver mountain and wave logo placed in the center of the X (shown below).  *Id.* ¶¶ 21, 26.



C.     **The Current Dispute**

ESPN alleges in its Complaint that Quiksilver adopted an infringing stylized X mark in 2007, with full knowledge of ESPN's prior rights in the X Games marks, and has willfully expanded the use of that allegedly infringing mark.  Complaint ¶¶ 18-20.  ESPN further claims that there is a likelihood of confusion as to an affiliation or relationship between ESPN's X Games and Quiksilver's products bearing the X mark, which is compounded by the participation in the X Games of athletes who are associated with Quiksilver and its products (*i.e.*, Messrs. Slater, Marzo, Wilson, and Rice).  Complaint ¶ 22.

This case, however, will not be limited to Quiksilver's recent use of the letter X on its clothing.  Instead, as described in detail in Quiksilver's Answer and Counterclaims, much of the focus of this case will be on Quiksilver's historic "X" designs in its Gen X Brand, going back to the 1980s.  Indeed, Quiksilver alleges in its Counterclaim that it is the senior user of the X-related trademarks, and accordingly cannot infringe or dilute ESPN's X Games marks due to its priority of use.  Counterclaim at ¶¶ 43-44.  Quiksilver also alleges that, if there is confusion

---

[1] For a detailed discussion of the history of the Gen X Brand, and for representative samples, Quiksilver respectfully directs the Court to its Counterclaim at ¶¶ 15-26.

between the two parties' marks, then that confusion is being caused by ESPN. *Id.* at ¶¶ 48-49.

Thus, based on the above claims and counterclaims, some of the key issues in this case will be:

1.    When the parties first began using their respective X-related marks;

2.    How the parties' X-related marks were created and developed (*i.e.*, the parties' intent in adopting the X-related marks, one of the *Polaroid*[2] factors for determining likelihood of confusion);

3.    Quiksilver's use of its Gen X Brand and designs over the last two decades, as well as its current use of that brand (*i.e.*, the sight/sound/appearance of the marks, another *Polaroid* factor);

4.    ESPN's use of its X Games marks;

5.    The parties' past and present channels of trade to market and sell the products bearing the X-related marks (another *Polaroid* factor);

6.    The parties' advertising and sales of products bearing the X-related marks (to determine strength of the marks, another *Polaroid* factor); and

7.    Any actual confusion between the two parties' marks (a crucial *Polaroid* factor).

**D.    <u>Witnesses and Evidence Related to the X Marks</u>**

In response to the allegations contained in ESPN's complaint, and in support of its own allegations, Quiksilver expects to put on evidence related to the creation, development, use, marketing, and sales of the Gen X Brand, and merchandise bearing those marks. All of the designs used under the Gen X Brand were created and developed by Quiksilver employees and consultants. Milstein Decl. ¶ 4. Several of these people are still employed by Quiksilver and work in its Huntington Beach headquarters. *Id.* Quiksilver expects it will call as witnesses in this case at least the following current employees:

_____

[2] *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961) (setting forth the factors for determining a likelihood of confusion).

1.      Bob McKnight: Mr. McKnight is the Chairman and CEO of Quiksilver, and has been with the company since its creation.  He is expected to testify about the company in general, its branding and marketing philosophies over time, and the use of the Gen X Brand over time.  *Id.* at ¶ 5(a).

2.      Bill Bussiere: Mr. Bussiere is the CFO of Quiksilver Americas and has been with the company since 1998.  He is expected to testify about Quiksilver's financial information including sales, profits, advertising and marketing expenditures, and other financial information regarding the Gen X Brand.  *Id.* at ¶ 5(b).

3.       Thomas Webster: Mr. Webster is the Senior Vice President of Finance at Quiksilver, and has been with the company since 1996.  He is expected to testify about Quiksilver's financial information including sales, profits, advertising and marketing expenditures, and other financial information regarding the Gen X Brand.  *Id.* at ¶ 5(c).

4.      Simon Buttonshaw:  Mr. Buttonshaw currently works as a designer for Quiksilver, but resides in Australia and currently travels to California about every six weeks.  He was involved in creating the Gen X Brand, and is expected to testify that he helped conceive of the Gen X Brand in the 1980s, and that the letter X has become synonymous with Quiksilver. *Id.* at ¶ 5(d).

5.       Peter Webb: Mr. Webb is a design consultant for Quiksilver in Australia. Mr. Webb is expected to testify about his work on the early Gen X Brand designs in the mid to late 1980s and early 1990s.  *Id.* at ¶ 5(e).

6.      Willy Morris: Mr. Morris is Quiksilver's West Coast Sales Manager for Wintersports.  He was previously a professional surfer sponsored by Quiksilver before joining the company in 1986 as an independent sales rep, and later took a position directly with the company in 2004.  Mr. Morris is expected to testify about the early use of the Gen X Brand and its use over time on wintersports products.  *Id.* at ¶ 5(f).

7.      Greg Macias: Mr. Macias is the Vice President of Marketing for Quiksilver.  He has been with the company since 1988.  Mr. Macias is expected to testify about

Quiksilver's marketing and advertising efforts as to the Gen X Brand over time, the historical development of the Gen X Brand, and Quiksilver's sponsorship of the X Games.  *Id.* at ¶ 5(g).

8.    Steve Fontes: Mr. Fontes is a Design Director for Quiksilver.  He joined the company in 1998.  Mr. Fontes is expected to testify about the development of the Gen X Brand over time, particularly use of the Gen X Brand on boardshorts.  *Id.* at ¶ 5(h).

9.    Greg Marre: Mr. Marre is the Vice President of Graphic Arts at Quiksilver and has been with the company since 1998.  Mr. Marre is expected to testify about the development of the Gen X Brand over time, including the creation and design of the X70 design.  *Id.* at ¶ 5(i).

10.    Matt Anderson: Mr. Anderson is the Senior Vice President of Design for Quiksilver and has worked for the company since 1997.  Mr. Anderson was involved in the development of the X70 design, and is expected to testify about that process.  *Id.* at ¶ 5(j).

11.    Brian Craighill: Mr. Craighill is Quiksilver's Snow Team Manager and has been with the company since 2001.  Mr. Craighill is expected to testify about the participation of Quiksilver's sponsored athletes in the X Games and the use of the Gen X Brand on wintersports products.  *Id.* at ¶ 5(k).

12.    Roger Russell: Mr. Russell is Quiksilver's Director of Marketing, and has been with the company for 13 years.  Mr. Russell is expected to testify about Quiksilver's sponsorship of the Winter X Games, as well as the company's marketing efforts for the Gen X Brand.  *Id.* at ¶ 5(l).

13.    Tom Holbrook: Mr. Holbrook is the Executive Vice President, Strategic Brand Development, and is expected to testify about Quiksilver's use of the Gen X Brand over time.  *Id.* at ¶ 5(m).

Because most of Quiksilver's Gen X Brand designs were created so long ago, some of the personnel involved with their development and marketing are no longer employed at Quiksilver.  Milstein Decl. ¶ 6.  Their testimony will be especially critical to Quiksilver's case, as Quiksilver's defenses and counterclaims are primarily based on Quiksilver's prior use of the

Gen X Brand. *Id.* These witnesses are likely to have unique firsthand knowledge about the genesis of the Gen X Brand and designs. *Id.* Quiksilver still maintains some contact with these former employees, *id.* and will take all possible steps to encourage these third-party witnesses to voluntarily attend a trial in New York, but cannot depend on their willingness or availability to travel across the country and appear without the compulsion of a subpoena. Indeed, two witnesses, Taylor Whisenand and Shaeen Sadeghi, have refused to travel to New York, and a third witness, Tyson White, expressed concern about getting consent from his current employer to travel to New York. *Id.* at ¶ 7(c)-(d), (j). Some of the third-party witnesses that Quiksilver expects to call at trial, with current residence locations, are:

1.   Danny Kwock, Montecito, California: Mr. Kwock was a Senior Marketing Executive at Quiksilver and was involved in the marketing of the original Gen X Brand. He is expected to testify about how and when the concept for this brand came up, and will discuss the marketing of the Gen X designs and product lines. *Id.* at ¶ 7(a).

2.   Alan Gibby, Laguna Niguel, California: Mr. Gibby is an independent film producer, and has worked in the action sports industry for more than 25 years. Mr. Gibby is expected to testify that he first learned of the term "Gen X" from Quiksilver in 1989 or 1990. He is further expected to testify that executives at ESPN told him that they did not understand the concept of Generation X, so he made a video that could be shown to the ESPN sales staff to enable them to better understand what Generation X was in reference to. Mr. Gibby is further expected to testify that ESPN did not use any of its X Games trademarks until years after Quiksilver had already developed, and used, its own Gen X trademarks. *Id.* at ¶ 7(b).

3.   Taylor Whisenand, Costa Mesa, California: Mr. Wisnand is a former Quiksilver-sponsored surfer, and worked for the company from the mid-1990s to 2005 as the marketing director, responsible for marketing and advertising the Gen X Brand and its products. He is expected to testify about how those products were marketed, the marketing materials and channels used, and the success of the brand. Mr. Whisenand is not willing to travel to New York for trial. *Id.* at ¶ 7(c).

4.      Tyson White, Laguna Beach, California: Mr. White was an Art Director at Quiksilver and was the creative director of the Gen X Brand's X70 designs.  He is expected to testify about how and when the concept for this brand came up, and will discuss the marketing of the Gen X designs and product lines.  *Id.* at ¶ 7(d).

5.      Ian Votteri, Los Angeles, California: Mr. Votteri is the former operations director for ESPN's Winter X Games.  He is expected to testify about the participation of Quiksilver-sponsored athletes in those competitions, as well as ESPN's knowledge of Quiksilver and its marks.  Mr. Votteri was unwilling to speak with Quiksilver without consulting his attorney; accordingly, Quiksilver does not believe that Mr. Votteri will travel to New York voluntarily.  *Id.* at ¶ 7(e).

6.      Martial Crum, Hawaii: Mr. Crum is a former designer for Quiksilver and was involved in the development of the Gen X Brand.  He is expected to testify about the development process and use of the Gen X Brand.  *Id.* at ¶ 7(f).

7.      Jon Day, Laguna Beach, California: Mr. Day is a former graphic designer for Quiksilver and was involved in the development of the Gen X Brand.  He is expected to testify about the development process and use of the Gen X Brand.  *Id.* at ¶ 7(g).

8.      Eric Diamond, Dana Point, California: Mr. Diamond is a former boardshorts designer for Quiksilver and was involved in the development of the Gen X Brand. He is expected to testify about the development process and use of the Gen X Brand.  *Id.* at ¶ 7(h).

9.      Neil Harrison, Long Beach, California: Mr. Harrison was involved in the design and development of the Gen X Brand on clothing items, and is expected to testify about when, how, and why the brand and designs were chosen, which products they were used on, and how they were used in commerce.  *Id.* at ¶ 7(i).

10.      Shaheen Sadeghi, Laguna Nigel, California: Mr. Sadeghi is a former President of Quiksilver in the early 1990s, and is expected to testify about the development and use of the Gen X Brand during that time period.  Mr. Sadeghi is not willing to travel to New

York to testify at trial. *Id.* at ¶ 7(j).

In addition, given ESPN's specific allegations in its Complaint regarding the potential confusion caused by Messrs. Slater, Marzo, Wilson, and Rice, Quiksilver anticipates calling some or all of these athletes to testify as to whether they have experienced any confusion among fans or consumers between the X Games and the Gen X Brand. Messrs. Slater and Marzo live in Hawaii, and Mr. Slater maintains an office and spends significant time in the Central District of California. *Id.* at ¶ 8. Mr. Wilson lives in Australia, and Mr. Rice resides in Jackson Hole, Wyoming. *Id.*

Moreover, ESPN's recent licensing agreement to expand its X Games brand into the footwear space is likely to involve relevant information for this litigation. The companies that will be designing, developing, and managing the X Games footwear products are located in the Central District of California. Barry Decl. at Exh. F.

Most, if not all, of the documents, marketing materials, and other evidence related to the Gen X Brand are located in Huntington Beach. Milstein Decl. ¶ 9. Sales and inventory data, financial information, and product samples are all maintained at Quiksilver's Huntington Beach headquarters. *Id.* Because Quiksilver is dealing with twenty years' worth of documents and evidence, dating back to the mid-1980s, the volume of materials is significant, and most of it will not be electronic. *Id.* Indeed, Quiksilver has already collected, for use in this litigation, original hand drawings of Gen X Brand designs and a substantial amount of fabric and product samples from its archives, all of which would be difficult to transport to this District, especially since Quiksilver would be extremely concerned about shipping its irreplaceable historical drawings and fabric and product archives. *Id.* Moreover, to date, Quiksilver's library of product offerings, fabric swatches, catalogs, documents and drawings, going back to the 1980s, take up substantial space (the fabric archives alone fill two cabinets), and Quiksilver is still in the process of collecting these materials. *Id.*

## II.    ARGUMENT

### A.    Standards for Transfer of Venue Under 28 U.S.C. § 1404(a)

Transfers of cases between Federal Districts is governed by 28 U.S.C. § 1404(a), which states that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  Thus, to obtain a transfer of venue, "the moving party bears the burden of establishing 1) that the action is one that 'might have been brought' in the district to which the movant seeks to have it transferred, and 2) that transfer is appropriate based on the convenience of the parties, the convenience of witnesses and the interests of justice."  *Posven, C.A. v. Liberty Mut. Ins. Co.*, 303 F. Supp. 2d 391, 400-01 (S.D.N.Y. 2004) (internal citation omitted).

"In determining whether transfer is warranted for the convenience of parties and witnesses and in the interests of justice, courts consider the following factors: (1) the convenience of the witnesses, (2) the convenience of the parties, (3) the location of relevant documents and the relative ease of access to sources of proof, (4) the locus of operative facts, (5) the availability of process to compel the attendance of unwilling witnesses, (6) the relative means of the parties, (7) the forum's familiarity with governing law, (8) the weight accorded to plaintiff's choice of forum, and (9) trial efficiency and the interests of justice, based on the totality of the circumstances."  *Fuji Photo Film Co., LTD., v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 373 (S.D.N.Y. 2006).

### B.    This Action Could Have Been Brought in the Central District of California

The threshold requirement for a case to be transferred under § 1404(a) is that "the action is one that 'might have been brought' in the district to which the movant seeks to have it transferred."  *Posven*, 303 F. Supp. 2d at 400.  In other words, Quiksilver must establish that this case could have properly been brought in the Central District of California.

This requirement is easily met.  Quiksilver is headquartered in Huntington Beach, California, which is located in the Central District of California.  Thus, the Central District of California has general personal jurisdiction over Quiksilver, a resident of the state.  Moreover,

venue is proper in that District under 28 U.S.C. § 1391(b)(1)-(2), since Quiksilver is domiciled in the Central District and a substantial part of the events at issue in this case occurred in that District. ESPN is also subject to general personal jurisdiction in California, as it maintains offices and staff there and thus has continuous and systematic contacts with the State and the Central District of California.

**C.**    **The Balance of Factors Weigh in Favor of Transfer**

All of the relevant factors for a convenience transfer either strongly favor a transfer to the Central District of California, or are at least neutral as to such a transfer. Thus, Quiksilver's motion should be granted.

1.    Convenience of the Witnesses

"Convenience of both the party and non-party witnesses is probably the single-most important factor in the analysis of whether transfer should be granted." *Berman v. Informix Corp.*, 30 F. Supp. 2d 653, 657 (S.D.N.Y. 1998). When weighing the convenience of witnesses, "a court does not merely tally the number of witnesses who reside in the current forum in comparison to the number located in the proposed transferee forum. Instead, the court must qualitatively evaluate the materiality of the testimony that the witnesses may provide." *Herbert Ltd. P'ship v. Elec. Arts Inc.*, 325 F. Supp. 2d 282, 286 (S.D.N.Y. 2004). In infringement cases, the key witnesses are "those officers and employees who were involved in the design, production, and sale of the [allegedly infringing] products." *AEC One Stop Group, Inc. v. CD Listening Bar, Inc.*, 326 F. Supp. 2d 525, 529 (S.D.N.Y. 2004).

Quiksilver's most crucial witnesses are those employees that participated in the design, production, and sale of the clothing and goods under the Gen X Brand. Most of those witnesses, both current and former employees, are located in the Central District of California. Quiksilver also believes that the testimony of its sponsored athletes, whom ESPN has specifically alleged are contributing the confusion between the marks, will be essential to its case. Two of those athletes live in Hawaii (and Mr. Slater maintains an office in the Central District), and a third lives in Wyoming, both of which are significantly closer to California than

to New York.  The fourth athlete, as well as one of Quiksilver's former employees expected to
testify, reside in Australia.  While Australia is not particularly convenient to either forum, it is
much closer to California than it is to New York (7,500 vs. 10,000 miles).  *See, e.g.*, *Fuji Film*,
415 F. Supp. 2d at 374 ("Because California is significantly closer to Japan than is New York, it
is also more convenient for [plaintiff] Fuji Ltd.'s witnesses").  Quiksilver is not aware of any
witnesses that reside in the State of New York.

      ESPN is located in Bristol, Connecticut, more than 100 miles from this Court.
Thus, any witnesses from that location will be required to travel, and accordingly are not local to
this Court.  Moreover, ESPN has a significant presence, indeed, a West Coast headquarters, in
the Central District of California, such that some of its witnesses are likely located there.  Even
in the unlikely scenario that most of ESPN's witnesses are residents of the East Coast, ESPN
witnesses traveling to the Central District would have access to company offices and facilities,
whereas Quiksilver witnesses would not have the same conveniences if forced to travel to New
York City.[3]

      Moreover, presumably there will be numerous witnesses (whether ESPN
employees or third parties such as vendors, contractors, and advertisers) who have worked on, or
will work on, the Summer X Games in Los Angeles.  As ESPN admits in its Complaint, a major
portion of the sales of its X Games goods are sold at the X Games, and thus people who worked
at past X Games (or will work at the upcoming games this summer) will have relevant testimony
about sales, products for sale, and consumer confusion.  Because the Summer X Games have
been held in Los Angeles every year since 2003, most of these witnesses will almost certainly be
located in the Los Angeles area.

      Finally, ESPN's exclusive licensees for its X Games footwear products, American
Sporting Goods and Nice Skate Shoes, are located in the Central District of California.  The

---

[3] Quiksilver merely has retail stores and a retail showroom in New York City, which do not have
the administrative support staff or facilities that would be necessary to house Quiksilver's
personnel and witnesses for a trial in this matter.  Milstein Decl. ¶ 10.

personnel from these two companies will have relevant evidence about the use of the X Games

marks on footwear products and any likelihood of confusion between the parties' marks. It is

highly doubtful that these individuals will voluntarily travel to New York at Quiksilver's request.

Accordingly, this factor weighs strongly, if not conclusively, in favor of transfer.

2.     Locus of Operative Facts

None of the operative facts in this case occurred, or are even remotely connected

to, the Southern District of New York (or, for that matter, the State of New York). While

Quiksilver markets and sells its products in New York, the same can be said for all major (and

many smaller) cities in the United States, so ESPN cannot rely upon those sales to oppose this

motion. *Matra Et Manurhin v. Int'l Armament Co.*, 628 F. Supp. 1532, 1536 (S.D.N.Y. 1986)

(finding that sale of goods in a forum does not establish a material connection to the forum if the

goods are sold in many states). There are no facts of this case that are particular to New York.

Indeed, the only specific nexus to New York that ESPN alleged in its Complaint is that

Quiksilver's stock is traded on the New York Stock Exchange. Complaint ¶ 10. ESPN is

apparently unaware of any relevant facts that are connected to this District (or even to this State).

By contrast, an overwhelming portion of the operative facts in this case occurred

in the Central District of California, or in close proximity thereto.

On Quiksilver's side, all Gen X Brand designs and products which ESPN alleges

are infringing and diluting its X Games marks were created and developed by Quiksilver in

California. Marketing, advertising, and distribution for goods bearing the Gen X Brand were

handled out of the company's Southern California headquarters.

On ESPN's side, 10 of the 25 X Games have been held in California, and 6 of

those were held in the Central District, with the upcoming 2008 Summer X Games also to be

held in that District. *None* of the X Games have ever been held in this District (or in the State of

New York). Given that ESPN has alleged infringement and dilution of its X Games marks, it

makes sense that a major portion of the operative facts for those claims would be located where

those games were held. Indeed, ESPN alleges in its Complaint that its goods were sold at the

13

"hundreds of X Games events," and much of the evidence ESPN attached to its Complaint showing its use of the X Games marks includes apparel that is specifically from last year's Los Angeles X Games.  Complaint ¶ 16, Attachment A.  The only other alleged sales locations are the Internet and department stores such as JC Penney, neither of which has any particular connection to New York.  *Id.*

ESPN may argue that a substantial number of events occurred at its headquarters in Bristol, Connecticut, which is sufficiently close to this District to support keeping the case here.  This argument fails, however, because the connection must be with, not near, the chosen forum.  *De Jesus v. National R. Passenger Corp.*, 725 F. Supp. 207, 209 (S.D.N.Y. 1989) ("the proximity of New York to New Jersey does not alter the fact that this case has no significant connection with this forum, while it has substantial connection with New Jersey").

        3.    <u>Location of Relevant Documents and Sources of Proof</u>

The location of documents is an important consideration in a motion to transfer. *Fuji Photo*, 415 F. Supp. 2d at 374.

Here, all of Quiksilver's relevant documents and evidence, including extensive archival product and fabric samples and original hand drawings, are located in the Central District of California.  In addition, the volume of documents and evidence involved favors transfer to that District.  Quiksilver is relying on use of its marks that go back approximately 20 years, whereas ESPN admits that it did not begin using its X Games marks until 1996. Complaint ¶ 12.

While ESPN undoubtedly has relevant documents in its corporate headquarters, those headquarters are located outside of this District.

Thus, this factor favors transfer.

        4.    <u>Convenience of the Parties</u>

As with Quiksilver's witnesses, all of Quiksilver's executives who are responsible for handling this litigation are located in the Central District of California.  Quiksilver has no appreciable presence in the Southern District of New York, and would not have access to

company offices and personnel if forced to litigate here.

Presumably at least some of ESPN's executives travel to the Central District of California regularly, to oversee the Los Angeles X Games. And while some of ESPN's executives responsible for this litigation may be located at its headquarters in Connecticut, those executives will still be required to travel to New York. Granted, traveling to New York is more convenient than traveling to California, but some travel is still involved. And ESPN's West Coast headquarters in Los Angeles would be available to any ESPN personnel who would be required to travel to the Central District of California, thus easing some of the inconvenience. Accordingly, this factor favors transfer.

### 5. Compelling Unwilling Witnesses

Federal court subpoenas are limited to a 100-mile radius from the place of trial. Fed. Rule Civ. Proc. 45(b)(2)(b) ("a subpoena may be served at any place: . . . outside [the district in which the action is pending] but within 100 miles of the place specified for the deposition, hearing, trial, production, or inspection"). As detailed above, Quiksilver has multiple, crucial third party witnesses who live in the Central District of California (Messrs. Kwock, Gibby, Whisenand, White, Votteri, Day, Diamond, Harrison and Sadeghi). These witnesses would be well outside the subpoena range of the Southern District of New York, but easily subject to the subpoena power of the Central District of California. Quiksilver's case will be severely prejudiced if it is unable to present these witnesses live at trial, and it cannot guarantee that the witnesses will attend trial in New York voluntarily, or have the availability to do so.

Moreover, Quiksilver is in no better position in this District than in the Central District of California with respect to subpoenaing current and former ESPN personnel to appear at trial. ESPN's headquarters in Bristol, Connecticut, are outside the subpoena range of this Court (Bristol is 111 miles away from this Court). If those witnesses reside in or east of Bristol, this Court's subpoena will not reach them. Accordingly, this factor favors transfer. Indeed, if this case is not transferred, it is possible that the parties will not be able to compel any witnesses

to testify in person at trial by way of a subpoena.

      6.     <u>Plaintiff's Choice of Forum</u>

While the plaintiff's choice of forum is usually given substantial weight in a venue transfer determination, this weight is greatly diminished when the plaintiff is not domiciled in that forum, and when the operative facts of the case have little connection to the chosen forum. *January Enters. v. Buena Vista TV*, 41 U.S.P.Q.2D 1959, *3 (S.D.N.Y. 1997); *see also Cheong v. Okayama Enters.*, No. 00 Civ. 03740 (GEL), 2000 U.S. Dist. LEXIS 13918, at *5 (S.D.N.Y. Sept. 25, 2000) (transferring case from S.D.N.Y. to C.D. Cal. because "most of the factors relevant to transfer of venue either favor the transfer or are neutral" and plaintiff was not a resident of New York).

ESPN is a Delaware corporation and is headquartered in Connecticut. Thus, its choice of the Southern District of New York as the forum for this action should be accorded very little weight. In addition, as discussed above, none of the operative facts has any connection to this District. Accordingly, this factor is neutral as to the requested transfer.

      7.     <u>Relative Means of the Parties</u>

The parties are both large, multinational corporations of relatively similar means, so this factor is neutral.

      8.     <u>Forum's Familiarity with Governing Law</u>

This Court is equally familiar with federal trademark law as the courts of the Central District of California. Moreover, the fact that ESPN has alleged New York state law claims[4] has no bearing on a transfer decision, since federal courts "commonly apply state substantive law, which may not be the law of the state in which the federal court sits." *Kwik Goal, Ltd. v. Youth Sports Publ'g Inc.*, No. 06 Civ. 395 (HB), 2006 U.S. Dist. LEXIS

---

[4] Quiksilver has also alleged New York state law counterclaims, since this action is currently pending in New York, and those claims had to be alleged as compulsory counterclaims under FRCP 13(a)(1). Should this case be transferred to the Central District of California, Quiksilver will likely amend its Counterclaim to substitute California state law claims in lieu of the New York state law claims.

34460, at *12 (S.D.N.Y. May 31, 2006) (finding plaintiffs' argument that assertion of two New York state law claims should keep case in the SDNY to be "unavailing"); *see also Prudential Sec. Inc. v. Norcom Dev., Inc.*, No. 97 Civ. 6308 (DC) , 1998 U.S. Dist. LEXIS 10569, at *17 (S.D.N.Y. July 15, 1998) ("the 'governing law' factor is to be accorded little weight on a motion to transfer venue because federal courts are deemed capable of applying the substantive law of other states").  This makes sense, as otherwise a plaintiff could assert state law claims for no other reason than to ensure that the case cannot be transferred to a different district.  Accordingly, this factor is neutral.

9.    <u>Trial Efficiency and Interests of Justice</u>

There has been no significant activity in this case, as only the initial pleadings (and this Motion) have been filed to date.  Accordingly, there is no particular efficiency in keeping the case with this Court.  *See Cartier v. D & D Jewelry Imps.*, 510 F. Supp. 2d 344, 347 (S.D.N.Y. 2007) ("The case has not proceeded to any noteworthy extent before this Court, such that it would be more efficient to retain it.").  Thus, this factor is neutral.

**III.    <u>CONCLUSION</u>**

Given the lack of any appreciable nexus to the Southern District of New York, it would be in the interests of justice to transfer this case to a District that is better suited for the witnesses, parties, and operative facts.  Any inconvenience that would befall ESPN would be slight, as ESPN has substantial facilities in Los Angeles, and will presumably be spending significant time there in the coming months setting up and operating the 2008 Summer X Games.

This case could have been brought in the Central District of California and all of the relevant transfer factors favor a transfer, or are neutral.  None of those factors favors keeping this case in this District.

17

Accordingly, and for the foregoing reasons, Quiksilver respectfully requests that the Court issue an Order transferring this case to the Central District of California.

Dated: Costa Mesa, California

June 16, 2008                              LATHAM & WATKINS LLP

By:    /s/ Mark A. Finkelstein
    Kenneth Conboy (KC 1154)
    Jaron R. Shipp (JS 6365)
    885 Third Avenue, Suite 1000
    New York, New York 10022
    (212) 906-1200
    kenneth.conboy@lw.com
    jaron.shipp@lw.com

    Mark A. Finkelstein (MF 1040)
    650 Town Center Drive, Suite 2000
    Costa Mesa, California 92626
    (714) 540-1235
    mark.finkelstein@lw.com
    Admitted *pro hac vice*

    Jennifer L. Barry (JB 0245)
    600 West Broadway, Suite 1800
    San Diego, California 92101
    (619) 236-1234
    jennifer.barry@lw.com
    Admitted *pro hac vice*

    Attorneys for Defendant
    and Counterclaimant
    *Quiksilver, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2008, I caused the attached document to be electronically transmitted to the Clerk's Office using the CM/ECF System.

I further certify that on this same date, I caused the attached document to be hand delivered as a Chambers Copy to:

Hon. Colleen McMahon
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl St., Room 640
New York, NY 10007

I further certify that on this same date, I caused the attached document to be sent via email and overnight delivery to:

Frank Ryan
Tamar Y. Duvdevani
Nixon Peabody LLP
437 Madison Avenue
New York, NY 10022
FRyan@nixonpeabody.com
tduvdevani@nixonpeabody.com

_____/s/ Mark A. Finkelstein_____
Mark A. Finkelstein