UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ESPN, INC.,<br><br>                      Plaintiff,<br>v.<br><br>QUIKSILVER, INC.,<br><br>                      Defendant.<br><br>QUIKSILVER, INC.,<br><br>                      Counterclaimant,<br>v.<br><br>ESPN, INC.,<br><br>                      Counterdefendant. | 08 Civ. 4222 (CM) (MHD)<br>ECF Case<br><br>**DECLARATION OF MITCH MILSTEIN IN SUPPORT OF DEFENDANT AND COUNTERCLAIMANT QUIKSILVER, INC.'S MOTION FOR TRANSFER OF VENUE TO THE CENTRAL DISTRICT OF CALIFORNIA PURSUANT TO 28 U.S.C. § 1404(A)** |

I, Mitch Milstein, hereby declare as follows:

        1.        I am the General Counsel for Global IP for defendant and counterclaimant Quiksilver, Inc. ("Quiksilver"). In that capacity, and based on the investigation I performed related to this matter, I have personal knowledge of the matters set forth herein and, if called upon to do so, could and would testify as set out herein.

        2.        Quiksilver is a Delaware corporation with global and North American headquarters in Huntington Beach, California.

        3.        Quiksilver is an international company that, among other things, designs, produces, and distributes clothing and accessories targeted at the surfing and boardriding lifestyle. Quiksilver's products are sold throughout the world, primarily in surf shops, skate shops, and other specialty stores.

        4.        It is my understanding, based on my investigation into this matter, that all of the designs used under Quiksilver's Gen X Brand (as that term is defined in the Motion) were created and developed by Quiksilver employees and consultants. Several of these people are still

employed by Quiksilver and work in its Huntington Beach headquarters.

5. I understand that Quiksilver expects to call as witnesses in this case at least the following current employees:

a. Bob McKnight, the Chairman and CEO of Quiksilver. Mr. McKnight has been with the company since its inception. I expect Mr. McKnight to testify regarding the company in general, as well as Quiksilver's branding and marking philosophies over time, and the use of the Gen X Brand over time.

b. Bill Bussiere, the CFO of Quiksilver Americas. Mr. Bussiere has been with the company since 1998. I expect Mr. Bussiere to testify regarding Quiksilver's financial information including sales, profits, advertising and marketing expenditures, and other financial information regarding the Gen X Brand.

c. Thomas Webster, Quiksilver's Senior Vice President of Finance (employed at Quiksilver since 1996). I expect Mr. Webster to testify regarding Quiksilver's financial information including sales, profits, advertising and marketing expenditures, and other financial information regarding the Gen X Brand.

d. Simon Buttonshaw, a Quiksilver designer residing in Australia who currently travels to California about every six weeks. After speaking with Mr. Buttonshaw, I anticipate that he will testify regarding his participation in the creation of the Gen X Brand in the mid to late 1980s, and how the letter X has become synonymous with Quiksilver.

e. Peter Webb, a design consultant for Quiksilver in Australia. I expect Mr. Webb to testify regarding his work on early Gen X Brand designs in the mid to late 1980s and early 1990s.

f. Willy Morris, currently the West Coast Sales Manager for Wintersports and previously a professional surfer sponsored by Quiksilver. After speaking with Mr. Morris, I anticipate that he will testify regarding the early use of the Gen X Brand and its use over time on wintersports products.

g. Greg Macias, Quiksilver's Vice President of Marketing. Mr.

Macias has been with the company since 1988. I expect Mr. Macias to testify regarding Quiksilver's marketing and advertising efforts as to the Gen X Brand over time, the historical development of the Gen X Brand, and Quiksilver's sponsorship of the X Games.

        h.        Steve Fontes, a Quiksilver Design Director and an employee since 1998. After speaking with Mr. Fontes, I anticipate that he will testify regarding the development of the Gen X brand over time, particularly use of the Gen X Brand on boardshorts.

        i.        Greg Marre, Quiksilver's Vice President of Graphic Arts. Mr. Marre has been with Quiksilver since 1998. After speaking with Mr. Marre, I anticipate that he will testify regarding the development of the Gen X Brand over time, including the creation and design of the X70 design.

        j.        Matt Anderson, Senior Vice President of Design for Quiksilver (employed at the company since 1997). After speaking with Mr. Anderson, I anticipate that he will testify regarding his involvement in developing the X70 design.

        k.        Brian Craighill, Quiksilver's Snow Team Manager since 2001. After speaking with Mr. Craighill, I anticipate that he will testify regarding Quiksilver's sponsored athletes in the X Games and the use of the Gen X Brand on wintersports products.

        l.        Roger Russell, Quiksilver's Director of Marketing. Mr. Russell has been with Quiksilver for 13 years. After speaking with Mr. Russell, I anticipate that he will testify regarding Quiksilver's sponsorship of the Winter X Games and Quiksilver's marketing efforts for the Gen X Brand.

        m.        Tom Holbrook, Executive Vice President, Strategic Brand Development. Mr. Holbrook is expected to testify about Quiksilver's use of the Gen X Brand over time.

        6.        It is my understanding, based on my investigation in this matter as well as my knowledge of Quiksilver's product offerings, that most of Quiksilver's Gen X Brand designs were created many years ago. Some of the personnel involved with their development and marketing are no longer employed at Quiksilver. I believe that the testimony of individuals with

personal knowledge about these topics will be especially critical to Quiksilver's case, particularly Quiksilver's defenses and counterclaims based on its prior use of the Gen X Brand. These third party witnesses are likely to have unique firsthand knowledge about the creation of the Gen X Brand and designs. I understand that some Quiksilver employees may maintain some contact with these former employees.

    7.  The following represents my understanding of the availability, location and anticipated testimony of third-party witnesses that Quiksilver expects to call in this matter:

    a.  Danny Kwock, Montecito, California: I understand that Mr. Kwock is a former Senior Marketing Executive at Quiksilver who was involved in the marketing of the original Gen X Brand. I expect Mr. Kwock to testify about how and when the concept for this brand came up, and to discuss the marketing of the Gen X designs and product lines.

    b.  After speaking with Alan Gibby, a current Laguna Niguel, California, resident and independent film producer who has worked in the action sports industry for more than 25 years, I anticipate that Mr. Gibby would testify that he first learned of the phrase "Gen X" from Quiksilver in 1989 or 1990. I further expect Mr. Gibby to testify that executives at ESPN informed him that they did not understand the concept of Generation X, and that Mr. Gibby produced a video for the ESPN sales staff to enable them to better understand the reference to Generation X. Mr. Gibby is also expected to testify that ESPN did not use any of its X Games trademarks until years after Quiksilver had already developed, and used, its own Gen X trademarks. Mr. Gibby may also have documents and other evidence relevant to his testimony, all of which he states are located in his home or office in California. I believe that Mr. Gibby's testimony could be important to both Quiksilver's defense and its affirmative counterclaims. When asked whether he would be willing to travel to New York to testify at the trial in this case, Mr. Gibby stated that he would like to participate in this matter in order to provide the true facts of what occurred. But he further indicated that, if possible, he would prefer to not have to be involved to that extent. Accordingly, I do not believe that Quiksilver can depend on Mr. Gibby to voluntarily attend a trial in New York without the compulsion of a

subpoena.

    c.  Taylor Whisenand, Costa Mesa, California: I spoke with Mr. Whisenand on June 16, 2008. Mr. Wisnand is a former Quiksilver-sponsored surfer, and worked for the company from the mid-1990s to 2005 as the marketing director, responsible for marketing and advertising the Gen X Brand and its products. I expect Mr. Wisnand to testify about how those products were marketed, including marketing materials and channels used, and the success of the brand. Mr. Whisenand told me that he is not willing to travel to New York to testify at trial in this matter.

    d.  After speaking with Tyson White, a Laguna Beach, California resident, and former Quiksilver Art Director and creative director of the Gen X Brand's X70 designs, I expect Mr. White to testify about how and when the concept for this brand came up, and to discuss the use of the Gen X Brand designs on the various product lines. During my conversation with Mr. White, he expressed some concern about getting consent from his current employer to travel to New York to participate in this trial.

    e.  Ian Votteri, Los Angeles, California: I understand that Mr. Votteri is the former operations director for ESPN's Winter X Games, and I expect that Mr. Votteri would testify about the participation of Quiksilver-sponsored athletes in those competitions, as well as ESPN's knowledge of Quiksilver and its marks. I called Mr. Votteri on June 13, 2008. He was unwilling to speak to me without first consulting his attorney. Based on this response, I do not anticipate that Mr. Votteri will voluntarily attend trial in New York.

    f.  Martial Crum, Hawaii: I understand that Mr. Crum is a former designer for Quiksilver and was involved in the development of the Gen X Brand. I expect Mr. Crum to testify about the development process and use of the Gen X Brand.

    g.  Jon Day, Laguna Beach, California: I understand that Mr. Day is a former graphic designer for Quiksilver and was involved in the development of the Gen X Brand. I expect Mr. Day to testify about the development process and use of the Gen X Brand.

    h.  Eric Diamond, Dana Point, California: I understand that Mr.

Diamond is a former boardshorts designer for Quiksilver involved in the development of the Gen X Brand. I expect Mr. Diamond to testify about the development process and use of the Gen X Brand.

   i. Neil Harrison, Long Beach, California: I understand that Mr. Harrison was involved in the design and development of the Gen X Brand on clothing items. I expect Mr. Harrison to testify about when, how, and why the brand and designs were chosen, which products they were used on, and how they were used in commerce.

   j. Shaheen Sadeghi, Laguna Nigel, California: I spoke with Mr. Sadeghi on June 16, 2008. Mr. Sadeghi is a former President of Quiksilver in the early 1990s, and is expected to testify about the development and use of the Gen X Brand during that time period. Mr. Sadeghi told me that he is not willing to travel to New York to testify at trial.

  8. It is my understanding that Messrs. Slater and Marzo live in Hawaii; Mr. Slater maintains an office and spends a great deal of time in the greater Los Angeles area; it is also my understanding that Mr. Wilson lives in Australia and Mr. Rice resides in Jackson Hole, Wyoming.

  9. Quiksilver maintains most, if not all, of the documents, marketing materials, and other evidence related to the Gen X Brand in Huntington Beach, California. Sales and inventory data, financial information, and product samples are also maintained at Quiksilver's Huntington Beach headquarters. Because Quiksilver will be dealing with twenty years' worth of documents, dating back to the mid-1980s, I anticipate the volume of documents relevant to this lawsuit will likely be significant, and much of it will not be electronic. I have already overseen the collection of a substantial number of archived fabric and product samples, as well as original hand drawings, related to this litigation, all of which are irreplaceable and would be difficult to transport. Overall, Quiksilver's library of product offerings, fabric swatches, catalogs, documents and drawings, dating back to the 1980s, take up substantial space, with the fabric archives alone filling two cabinets.

  10. Quiksilver does not have offices or facilities in New York City, New

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

SD\633535.1

6

York, with either administrative capabilities or support staff that would be adequate to support Quiksilver personnel during a trial in this case.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. This declaration was executed on June 16, 2008, in Huntington Beach, California.

_____
Mitch Milstein

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2008, I caused the attached document to be electronically transmitted to the Clerk's Office using the CM/ECF System.

I further certify that on this same date, I caused the attached document to be hand delivered as a Chambers Copy to:

> Hon. Colleen McMahon
> Daniel Patrick Moynihan U.S. Courthouse
> 500 Pearl St., Room 640
> New York, NY 10007

I further certify that on this same date, I caused the attached document to be sent via email and overnight delivery to:

> Frank Ryan
> Tamar Y. Duvdevani
> Nixon Peabody LLP
> 437 Madison Avenue
> New York, NY 10022
> FRyan@nixonpeabody.com
> tduvdevani@nixonpeabody.com

/s/ Mark A. Finkelstein
Mark A. Finkelstein